*1359 OPINION.
Love :
The pleadings in these proceedings raise substantially only one issue, but in that connection a number of collateral or secondary questions arise. The primary issue concerns the amount of taxable income derived by petitioners in 1925 from the transactions evidenced by the contracts referred to in our findings of fact, above.
During the taxable year 1925 petitioners each received from the corporation the sum of $200,000, less amounts theretofore withdrawn by them in excess of salary, in consideration of the surrender of their rights and interests in the corporation and the cancellation of said contracts, with the exception of certain reserved interests not here material.
Each petitioner reported in his return for 1925 the entire amount of $200,000 as capital gain, and now contends that the amount so reported was excessive, in that the maximum amount of taxable capital gain realized was not more than $115,000. In each case the respondent treated the entire amount of $200,000 as ordinary income subject to tax at the normal and surtax rates. The respondent contends, first, that said amounts represent compensation paid to petitioners in the taxable year for personal services rendered in prior years, and, second, that even if said amounts be regarded as consideration paid for the cancellation of the contracts, the entire amount is taxable as ordinary income, since the contracts cost petitioners nothing.
The questions arising under the issue are: (1) Did petitioners, by the contract of April 1, 1920, thereby and at said time acquire a definite and vested interest in the corporation? (2) Did the petitioners, by the contracts of May 28, 1925,- effective as of April 1, 1925, sell their vested interests in the corporation for the consideration stated, or was the amount of $200,000 paid to each as compensation for personal services rendered? (3) If the transaction was a sale of property rights, to what basis are petitioners entitled in computing the gain derived from such sale? (4) Was the contract of April 1, 1920, which was merged or restated in the contract of October 12, 1922, a “ capital asset ” in the hands of petitioners, so that the gain derived by them upon its cancellation is subject to tax at the rate applicable to capital gains ? (5) Were the amounts in excess of salaries, withdrawn by petitioners prior to 1925, income to petitioners in the taxable year? These questions will be considered in the order stated.
Question 1. What result was effected by the contract of April 1, 1920? Under this contract, did petitioners at that time become the owners of definite interests in the corporation, or, as contended by the respondent, did the contract merely constitute a promise on *1360 the part of the corporation and its stockholders to give to each of petitioners 8 per cent of the common stock of the corporation at same indefinite date in the future when the corporation should be “ reorganized ” as provided in the contract ? The answers to these questions, we think, are to be found in the plain and unambiguous language of the instrument itself, which clearly sets forth the intention of the parties.
Prior to the execution of the contract, Howe, Snow and Bertles were the only stockholders of the corporation. They are referred to in the contract as the “ old stockholders ” and petitioners are referred to as “new stockholders.” The instrument provided that “As soon as it is deemed feasible and advisable to do so by the Corporation, and its counsel, the Corporation shall be reorganized,” etc. The contemplated “ reorganization ” appears to have consisted merely of a new set-up of the capital structure of the corporation, with a possible change of name. There was no provision for the dissolution for the then existing corporation and the organization of a new or successor corporation.
Under the so-called “ reorganization ” plan, the corporation was to have a capital stock consisting of 7,500 shares of 7 per cent cumulative preferred stock of the par value of $100 per share, and 7,500 shares of common stock of the same par value, or no par value, as might be deemed advisable at the time the “reorganization ” was made effective. It was provided that the preferred stock should be issued to the “ old stockholders ” in equal shares, and that the common stock should be issued 1,900 shares to each of the “ old stockholders ” and 600 shares to each of the “ new stockholders.” Thus, each of the new stockholders, including the petitioners, was to receive 8 per cent of the common stock of the corporation. The contract further provided:
The right and interest of the new stockholders respectively in the new corporation * * * shall become effective as of the First day of April, 1920, and their property rights and rights of dividends and other revenue and income from the corporation shall be precisely as though the corporation, hereinafter defined and provided for, had been completed and the stock issued as of April 1, 1920, and the rights of all parties from and after that date are defined and limited by this agreement.
Not only were petitioners each given a definite interest in the corporation effective on and after April 1, 1920, but the contract provided that in the case of an increase of the capital, “ each of the parties shall have the option to maintain his proportionate interest in the corporation as established by this agreement.”
Upon consideration of the instrument as a whole, in the light of the surrounding facts and circumstances disclosed by the record, it is our opinion that, immediately upon execution of the contract, *1361 petitioners each became the beneficial owner of 600 shares, or 8 per cent, of the common stock of the corporation precisely to the same extent as if the so-called reorganization had been effected on that date and a stock certificate issued to each petitioner for the interest given to him. As such stockholder, each petitioner became entitled on April 1, 1920, to receive dividends upon the stock given to him and to exercise all other rights, privileges and duties of stockholders.
Pursuant to the contract and by virtue of his ownership of the stock interest, each petitioner was elected an officer of the corporation and his authority correspondingly increased. Prior to the date of the contract, petitioners were highly valued employees of the corporation and they had theretofore made known their intention of severing their connections with the corporation unless they were given an interest in the business. The old stockholders, who were also the directors and officers of the corporation, desired to retain their services, and to that end each petitioner was given an 8 per cent interest in the corporation and its assets on April 1, 1920. The fact that the contemplated “ reorganization ” was not effected on said date and stock certificates issued to petitioners is immaterial. A stock certificate merely constitutes evidence of ownership of an interest in a corporation; it is not the stock itself nor esesntial to the ownership thereof. Richardson v. Shaw, 209 U. S. 365; Fletcher on Corporations, vol. V., p. 5604, § 3426.
Question ¾. Did the petitioners, by the contracts dated May 28, 1925, each sell as of April 1, 1925, his stock or interest in the corporation for $200,000, or was the amount paid to each compensation for personal services? A separate contract, each identical in term with the other, was executed by the corporation and petitioners, and each contract was designated “ Contract for Sale of Interest.” Petitioner in each contract was referred to as the “ Vendor ” and in each contract it was provided that:
The Company hereby agrees to pay to said Vendor forthwith the 'sum of Two Hundred Thousand Dollars ($200,000), less the present indebtedness of the Vendor to the Company appearing on its books', in consideration • of the surrender of the rights and interest of the Vendor herein referred to.
The rights and interest referred to are explained in the succeeding paragraph of the contract as “ all rights and interest of the Vendor in said Company or its ássets,” with exceptions not material here. This clearly indicates, we think, that petitioners acquired in 1920, ownership of definite interests in the corporation, which property rights or interests they sold to the corporation in 1925, each for a consideration of $200,000.
Question 3. Having reached the conclusion that petitioners acquired definite interests in the corporation in 1920, which interests constituted property, and such property having been sold by them *1362 to the corporation in the taxable year 1925, the next question is, to what basis are petitioners entitled in computing the gain from such sale ?
The respondent contends that the basis is cost, and that since the contract of April 1, 1920, cost petitioners nothing, the entire amount received by them upon its cancellation in 1925 represents taxable gain. This contention, we think, is erroneous. We are dealing here not with the exhaustion of a contract nor the sale of a contract. The contract in question was merely evidence of or defined the property rights which petitioners acquired thereunder at the time of its execution. Those property rights were given to petitioners on April 1, 1920, for the purpose of retaining their services for the corporation. It is not necessary to decide whether the property was acquired by petitioners as a gift or as compensation for services. If acquired as a gift, since acquired before December 31, 1920, the basis for determining the gain or loss from its subsequent sale is the fair market value of the property at the time of such acquisition. Sec. 204 (a) (4), Revenue Act of 1926.
' If the property was transferred to petitioners as compensation for services, the property when received constituted taxable income to petitioners, to the extent of its then fair market value, which we have found was $85,000, and only the difference between such fair market value in 1920 and the amount received therefor on its sale in 1925, constitutes taxable gain in the latter year. Fred J. Collins, 16 B. T. A. 1426; Saunders v. Commissioner, 29 Fed. (2d) 834; Schneider v. Duffy, 43 Fed. (2d) 642.
Question f. Was the contract of April 1, 1920, a capital asset in the hands of petitioners so that the gain derived upon its cancellation is taxable at the rate applicable to capital gains? The property rights acquired by petitioners under the contract in question were held by them for more than two years, namely, from April 1, 1920, to April 1,1925, and the sale thereof was consummated after December 31, 1921. Hence, the gain derived is, in our opinion, clearly capital gain within the following provisions of the Revenue Act of 1926:
Sec. 208. (a) For the purposes of this title—
(1) The term “ capital gain ” means taxable gain from the sale or exchange of capital assets consummated after December 31, 1921;
* * Hi * * * *
(8) The term “capital assets” means property held by the taxpayer for more than two years (whether or not connected with his trade or business) * * *.
Question 5. This brings us to the last question raised, that is to say, whether or not the amounts withdrawn by petitioners from the corporation prior to 1925, constitute income to or were received by *1363 petitioners in the taxable year. There now appears to be no serious controversy between the parties on this point.
Prior to 1925, and subsequent to the execution of the contract of April 1, 1920, no dividends were declared by the corporation either on the preferred or common stock. During this period, petitioners withdrew amounts from the corporation from time to time against their rights to receive dividends. Such amounts were charged to petitioners on their respective accounts on the books of the corporation, and the amounts of their specified salaries credited thereon. At December 31, 1924, petitioner Bradbury - had withdrawn from the corporation $48,835.69 in excess of salary credits, and petitioner Eifert had similarly withdrawn $36,890.31.
The respondent, in his brief, argues that these amounts were received by the respective parties in the taxable year, and petitioners in their brief, in effect, concede the fact. The debit balances referred to were carried by the corporation on its books as accounts receivable until execution of the contracts on May 28, 1925, when petitioner’s accounts were credited each with the amount of $200,000. The right of petitioners to the amount withdrawn prior to 1925 thus did not become absolute and unconditional until within the latter year, and the view that they received these amounts in said year is, in our opinion, therefore, correct.
Summarizing what we have said above, petitioners each acquired by gift on April 1, 1920, property having then a fair market value of $85,000. They sold said property in 1925 for $200,000. Each petitioner realized on such sale a capital gain of $115,000. The deficiencies will be redetermined accordingly.

J udgments will be entered under Rule 50.